In re Johnnie M. EMBERTON, Stacey A. Emberton, Debtors.

Johnnie M. Emberton, Stacey A. Emberton, Plaintiffs,

v.

Sidney Lobb, Doris Lobb, Terry Geoghegan, Defendants.

Bankruptcy No. 00–10169(1)(13).
Adversary No. 00–1070.

United States Bankruptcy Court, W.D. Kentucky.

May 22, 2001.

Philip Huddleston, Bowling Green, KY, for Debtors.

'William W. Lawrence, Louisville, KY, trustee.

### MEMORANDUM–OPINION

JOAN LLOYD COOPER, Bankruptcy Judge.

This case involves a claim by Plaintiffs Johnnie and Stacey Emberton, Debtors under a joint Chapter 13 petition with confirmed plan, against Defendants Sidney and Doris Lobb and Terry Geoghegan, the Hart County Commonwealth's Attorney, for a willful violation of the automatic stay of 11 U.S.C. § 362(a). The court held a trial on the merits and after considering all of the evidence before it, including the contents of the Court's adversary proceeding file in the instant case, the contents of the bankruptcy case, and the testimony of the witnesses and documentary evidence tendered, determines that the Defendants committed a willful violation of the automatic stay. Accordingly, the Court enters judgment for the Plaintiffs/Debtors. The following constitutes the Court's Findings

of Fact and Conclusions of Law pursuant to Fed. R. Bankr.P. 7052.

### FINDINGS OF FACT

On November 10, 1999, Johnnie and Stacey Emberton (the "Embertons") entered into a Contract for Deed to sell certain real property (the "Contract") to Sidney and Doris Lobb (the "Lobbs"). The Lobbs own several pieces of real estate in central Kentucky, at least two of which involve farming operations. The Contract provided that the Lobbs would make principal payments to the Embertons over three years totaling the sum of $27,169.50, consisting of a down payment and three consecutive annual payments beginning on December 30, 1999 and ending on December 30, 2001. The Contract provided that the principal payments would be made without interest and the Lobbs could not accelerate payments under the Contract, *i.e.*, prepay and force the Embertons to perform their end of the bargain ahead of the Contract schedule.

Upon completion of the annual payments on December 30, 2001, the Embertons were to transfer the real estate to the Lobbs by way of a General Warranty Deed. While the Contract provides limited other details of the agreement, it does not include any representations or warranties concerning the state of the title at the time of the execution of the Contract. The Embertons testified at trial that they made Mr. Lobb aware of the mortgage lien on the property held by Kentucky Banking Centers, but were unaware of the existence of a judgment lien filed against the property by Norwest Financial.

Mr. Emberton testified further that given the time set out in the Contract, the payments to be made by the Lobbs, his future earnings and his retirement savings with his employer, that he would be able to perform his end of the Contract on December 30, 2001. Indeed, at the time of trial in April 2001 the time for performance of the Contract had not yet expired and the Embertons then had only one remaining encumbrance on the property, the mortgage held by Kentucky Banking Centers.

By December 30, 1999, the Lobbs had paid the Embertons the down payment and the first annual installment, totaling the sum of $13,056.50. On February 11, 2000, the Embertons filed a Chapter 13 bankruptcy petition, schedules of their assets and liabilities, a statement of affairs and a Plan. On the date the petition was filed, the Embertons served a copy of their Plan upon all of their creditors, including the Lobbs. The Plan provided, among other things, for rejection of the Contract with the Lobbs due to the fact that the Debtors were unable to perform by tendering to the Lobbs a General Warranty Deed upon completion of payments at the end of the term. The Plan also erroneously provided for voidance of five judgment liens allegedly encumbering the real property. It is clear that at the time the Chapter 13 case was proceeding a diligent search of the real property records in the Hart County Clerk's Office would have reflected that there was only one mortgage lien and one judgment lien encumbering the property.

The Lobbs retained bankruptcy counsel who entered an appearance in the case and filed an Objection to the Plan on March 20, 2000. The Objection was based on the invalidity of rejection, as an executory contract, of a land sale contract under Kentucky law and a lack of feasibility of the Plan itself. It should be noted that the Lobbs did not make any claim of fraud in the execution of the Contract in their Objection.

After a series of continuances of the first meeting of creditors in the case and a July 20, 2000 amendment to the Plan, the

amended Plan was confirmed on September 6, 2000. At the confirmation hearing, the Lobbs' through their bankruptcy counsel, articulated that they did not intend to press their Objection. Confirmation of the Plan resulted in rejection of the Contract and the provision for repayment to the Lobbs of their full claim with interest at the rate of 8% over 35 months.

While the creditors' meeting and confirmation process were moving along, a separate, hidden and disturbing track of activity was taking place. J.D. Craddock, the Hart County Attorney, testified at trial that on or about March 13, 2000, Mr. Lobb visited his office and gave him a copy of the Contract and the Plan filed in the bankruptcy. Mr. Craddock testified that Mr. Lobb asked whether a crime had been committed when the Embertons signed the Contract knowing there were five judgment liens on the property. He further testified that he investigated the matter utilizing his paralegal and that as a result of his investigation he determined that a crime had indeed been committed pursuant to KRS 514.040(d), Theft by Deception over $300.00. He then referred the matter to Terry Geoghegan, the Hart County Commonwealth's Attorney.

While both Mr. Lobb and Mr. Craddock testified that Mr. Lobb did not ask the County Attorney to take criminal action against the Embertons, Mr. Craddock's letter dated March 16, 2000 to the Hart County Commonwealth's Attorney, attached as Commonwealth's Exhibit 1, clearly indicates Mr. Craddock's understanding that Mr. Lobb wanted the case presented to the Grand Jury and that he would be present to testify. The letter further outlines Mr. Craddock's belief that there were multiple judgment liens on the property, the crime allegedly committed and requests the presentment of an indictment against the Embertons for a violation of KRS 514.040(d). Mr. Craddock testified that his investigation included a title search, yet it is undisputed by the parties that only one judgment lien was of record at the time. The letter indicates a copy of it was sent to Mr. Lobb.

Mr. Craddock failed to explain to the Court why he thought fraud had occurred when the Embertons did not make any representations or warranties as to the state of the title to the real estate in the Contract. A misrepresentation of a material fact was and is not evident from the face of the Contract. The Contract was prepared by Jon W. Goodman, a Munfordville, Kentucky attorney. If a term of the agreement was important to these parties, such as clear title at the time of execution of the Contract, it surely would have appeared in the Contract, which is by any lawyer's estimation, well-done.

The Hart County Commonwealth's Attorney did not explain to the Court what steps he took to investigate the matter, besides review what Craddock presented to him. It is clear to this Court that Mr. Lobb wanted action and two separate elected officials obliged his request and the Commonwealth's Attorney proceeded without making sure that certain material representations made to the Grand Jury were accurate.

The Commonwealth's Attorney submitted the matter to the Hart County Grand Jury on May 16th, 2000 with Mr. Lobb, under subpoena, as the grand jury witness. As a result, the Hart County Grand Jury handed down an Indictment on Count 1 of Theft by Deception over $300 and on Count 2 Complicity to Commit Theft by Deception over $300 against both of the Embertons. The Indictments, attached as Commonwealth's Exhibits 2 and 3, recite in part that the Embertons knew the real estate they contracted to sell was encum-

bered by multiple judgments and failed to advise the Lobbs of the judgments.

On May 18, 2000, in the early evening after they spent the day at Bankruptcy Court in a creditors' meeting, the Hart County Deputy Sheriff arrested Mr. and Mrs. Emberton at their·home. Also in attendance were their three children and several of their neighbors' children. When asked why they were being arrested, the Deputy Sheriff advised it was for "bad checks." Mrs. Emberton called her mother who lived nearby to come stay with the children. Upon her arrival to watch the children, the Embertons were hauled to jail, booked, which included being photographed, fingerprinted, separated from one another (for what ended up as a 21 day incarceration), searched, de-liced, given jail clothing and thrown into a detention cell or in the case of Mr. Emberton, "the drunk tank." During this time, the Embertons were not permitted even a glance at one another and all communication between them was prohibited, except that they could write one another and deliver the messages through the United States Postal Service.

Also, soon after their arrest, Mr. Emberton's ex-wife, Carolyn Emberton, due to Mr. Emberton's incarceration, filed a Motion in Hart Circuit Court to modify her visitation rights with her children. In addition, Sonya Handy, Mrs. Emberton's adult daughter, who took over watching the Embertons' children for Mrs. Emberton's mother while they were incarcerated, received two visits from social workers with the state of Kentucky to make sure the children were properly attended.

The Court is convinced from the totality of the evidence submitted that from the moment they were incarcerated to the time of their release from jail and including up to the time they signed the Pretrial Diversion Agreements, attached as Commonwealth's Exhibits 6 and 7, the Embertons did everything in their power, given their understanding and within their means to secure their freedom. The overwhelming and uncontroverted evidence is that their existence during this period was perfectly abysmal.

Once booked in jail, as soon as she was able, Mrs. Emberton contacted Sonya Handy, who testified of her efforts to secure counsel. Mrs. Handy initially hired attorney, John Rogers. Mrs. Handy used money from the Embertons' bank account to pay Mr. Rogers a retainer of $1,000, $500 of which he later returned. During his representation, his investigator reported to Mrs. Handy that several attempts were made to determine the status of the case and whether the bond could be reduced from the established bond of $9,500 full cash or $19,000 in property, a piece, a sum far in excess of the amount the Lobbs had paid to date on the Contract. Mrs. Handy reported that Mr. Rogers' office accomplished little. Later, Mr. Emberton's employer, Larry Glass discovered what happened from Mrs. Handy and contacted attorney T. Richard Alexander's office and requested his assistance.

Mr. Alexander testified at length of his efforts in the case. First, he attempted the same action as Mr. Rogers' office, that of calling the Hart Circuit Clerk's office to determine if the bond could be reduced in order to get the Embertons out of jail. Perhaps answering the question of why Mr. Rogers was unable to help, he learned that Judge Raikes would not consider the bond reduction without a motion and that the Court's next visit to Hart County would be on June 8, 2000. He also tried calling the Commonwealth Attorney's office but received no response. During the June 8, 2000 hearing, Donald Emberton, Mr. Emberton's brother, pledged his farm up to $38,000, again an amount well in

excess of the $13,056.50 paid by the Lobbs on the Contract, as bond for the Embertons' release. Thus, 21 days after their arrest, the Embertons were finally released from jail.

On August 1, 2000, the Commonwealth's Attorney made an offer of settlement to the Embertons through Mr. Alexander. In return for a plea of guilty by the Embertons on Count 2 for complicity to commit Theft by Deception over $300, the Commonwealth would dismiss Count 1 against each of them, but the Embertons would get a sentence of three years on Count 2 and the Commonwealth would oppose probation of the sentence. While the Commonwealth testified that their offer did not include any reference to restitution to the Lobbs, the Embertons aptly point to Kentucky law, KRS 533.250, which provides that any person convicted of a felony for taking property must restore the property to the victim as a condition of probation, i.e., their freedom.

Mr. Alexander's second major act was to write a letter to the Commonwealth's Attorney on September 28, 2000, tendering a copy of a Motion to Dismiss filed in the criminal action and outlining his factual and legal reasoning as to why the Embertons had not committed a crime. The defense made much of the fact that Mr. Alexander's letter suggests that his clients would entertain any reasonable plea and refers to the possibility of a pretrial diversion. Mr. Alexander satisfactorily described his state of mind during this period and the Court is convinced he believed negotiation with the Commonwealth was the best avenue available to the Embertons given the indictment, their lengthy prior incarceration, the use of the criminal procedure to collect a civil debt, their employment issues, and the threat of an impending pretrial hearing which would lead to a criminal trial unless the matter was settled. As stated by Mr. Alexander, he did not believe they had any other reasonable alternatives available to them. The Court accepts and determines that the execution of the Pretrial Diversion Agreements were made under extreme, unreasonable and unwarranted criminal action and the Embertons' severe emotional distress.

Apparently, Mr. Alexander did not receive a response to his first letter or the Motion to Dismiss. Mr. Alexander then wrote the Commonwealth's Attorney on October 4, 2000, again referencing his Motion to Dismiss and citing two applicable local federal court authorities. Mr. Alexander believed these authorities would support an injunction against further criminal prosecution. He also attached a draft of a Verified Petition for the preliminary injunction. He again suggested pretrial diversion or an Agreed Order dismissing the case without prejudice, all with the purpose of getting the Lobbs their money back. The Commonwealth did not respond to this letter either.

The parties then met at the pretrial hearing on October 6, 2000. Mr. Alexander testified at length about the environment of the hearing. Lawyers for the defense line up outside an ante-room where the prosecutors sit and the parties negotiate. If the negotiations fail, the pretrial hearing is held before the Judge and the matter is set for a jury trial at a later date. At this time, Mr. Alexander had the Embertons available for consultation and the Commonwealth had the Lobbs available for consultation. In the end, after much negotiation, the Embertons agreed to sign the Pretrial Diversion Agreements, in which each made an *Alford* plea.

Essentially, the Embertons did not agree that they were guilty of the crime, but only that there was sufficient evidence upon which a jury could convict them.

The agreement also provided for a pretrial diversion for the period of the Chapter 13 Plan, that the Plan be successfully completed as it relates to the Lobbs and that the Embertons amend the Plan to increase the Lobbs claim by $613.00 for lime Mr. Lobb spread upon the land. In return for the plea, the Commonwealth agreed to a sentence of one year.

The Pretrial Diversion Agreements clearly indicate that upon failure to comply with its terms, the diversion could be revoked after a hearing. Upon revocation of the diversion, the Embertons would then be sentenced to jail time. Earlier in this case when the Embertons moved for an injunction prohibiting revocation of the probation, the Court overruled the Motion due to the fact that the Commonwealth articulated that there would need to be a hearing before the probation could be revoked and the Embertons reincarcerated. The Court, in short, deemed there to be a separate legal remedy available to the Embertons in the form of a hearing before the Court.

On July 5, 2000, the Lobbs' bankruptcy attorney filed a Motion to Withdraw as the attorney of record for the Lobbs in the action. The Lobbs signed off on the Motion which while not specific states that for non-financial reasons the parties mutually agreed to terminate their relationship. The Court approved the Motion on July 6, 2000. The Lobbs' present attorney entered his appearance in the case on August 25, 2000 before the September 6, 2000 confirmation of the Plan.

The Embertons tendered evidence of the damages they suffered due to the actions of Mr. Lobb which started and continued their wrongful criminal prosecution to its conclusion. Those damages fall into the categories of lost wages, attorneys' fees, phone bills, bond costs and the value of the 2000 Tobacco Allotment referenced in the Contract that was rejected in the Plan. They claim compensatory damages in their prayer for relief of $106,250.00, plus punitive damages not less than triple their claim for compensatory damages or not less than triple the amount of their claim in the bankruptcy. The Embertons seek a permanent injunction against the Hart County Commonwealth's Attorney preventing further prosecution of the charges or enforcement of the Pretrial Diversion Agreements.

The evidence showed that Stacey Emberton lost wages for her 21 day incarceration or 120 hours of work at $7 per hour for $840.00. Further, when she went back to work she lost her recent $1 an hour raise due to her arrest and incarceration and was then working at $6 per hour until January 2001 for total lost wages during that period of $2,325.48. Johnnie Emberton submitted evidence that he lost gross wages in the sum of $1,587.18 during the incarceration. It is unknown how much time and expense their bankruptcy lawyer has put into this proceeding.

Further, Mr. Emberton testified and produced evidence that he had to borrow $1,500.00 from his employer once out of jail for living expenses. He is still paying that loan back. The Embertons incurred criminal attorney fees of $1,370.00 which are not yet entirely paid. They incurred $250.25 in phone charges for collect calls made by them from jail to Sonya Handy at their home. Not surprisingly, the Embertons testified that no one else would accept their collect phone calls from jail.

Donald Emberton paid $25.00 at the time he posted bail for the Embertons. Clearly, the Embertons owe this money to Donald Emberton. Further, Donald Emberton testified that as of approximately one month prior to trial when he called the Hart Circuit Clerk's office, his property was still subject to the $38,000 bail bond

encumbrance and will continue to be encumbered until October 2001.

Finally, the Embertons submitted evidence that the 2000 Tobacco Quota assigned to the Lobbs in the Contract was held by the Lobbs throughout the year 2000, subsequent to the rejection of the Contract. When the Embertons tried to revoke the Sale and Purchase of Burley Tobacco Quota executed on November 9, 1999, the Lobbs fought the revocation and ultimately succeeded in having the transfer approved even though Mr. Lobb testified at trial that the Tobacco Quota clearly was part of the Contract and that he paid nothing separate for it. In sum, this was yet another avenue of resistance the Lobbs undertook to the Embertons Chapter 13 proceeding. It is unclear what value Mr. Lobb received from the Tobacco Quota, but he testified that he gave the Quota to his son for no payment and that his son earned $1,700.00 from the sale of the tobacco.

### CONCLUSIONS OF LAW

The automatic stay prohibits any act to collect, assess or recover prepetition claims against the debtor. 11 U.S.C. § 362(a). The stay ensures that all claims against the debtor will be brought in a single forum, the Bankruptcy Court. It also protects the debtor by allowing it breathing space. It also protects creditors as a class from the possibility that one creditor will obtain payment on its claims to the detriment of all others. *In re Johnson*, 253 B.R. 857, 861 (Bankr.S.D.Ohio 2000).

■ The Bankruptcy Code precludes the use of criminal actions instituted for the purpose of collecting a debt. *In re Padgett*, 37 B.R. 280 (Bankr.W.D.Ky.1983). Subsection (h) of 11 U.S.C. § 362 provides for the imposition of damages for a willful violation of the stay as follows:

An individual injured by any willful violation of the stay provided by this section shall recover actual damages, including costs and attorneys fees, and, in appropriate circumstances, may recover punitive damages.

■ This section is not limited only to violators who had specific intent to violate the stay, but a violation of the stay can be considered willful when the creditor knew of the bankruptcy filing and violated the stay by an intentional act. *In re Sharon*, 234 B.R. 676, 687 (6th Cir. BAP 1999). In the case at bar, official notice of the Embertons' bankruptcy was mailed to Mr. and Mrs. Lobb on February 16, 2000, 25 days before Mr. Lobb visited Mr. Craddock. Mr. Lobb also participated in the bankruptcy by filing an Objection to the Chapter 13 Plan and attending several creditors' meetings. His actions, along with those of the Commonwealth's Attorney in seeking a criminal indictment against the Embertons, resulting in their arrest and incarceration for 21 days, compel the Court to conclude that Defendants committed a willful violation of the stay.

■ The Defendants contend that 11 U.S.C. § 362(b) contains an exception to the automatic stay for the "commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's or organization's police and regulatory power ..." 11 U.S.C. § 362(b)(4). However, this Court has repeatedly held that this exception does not apply where a criminal action is pursued and initiated against the debtor for the purpose of debt collection. *See In re Padgett*, 37 B.R. 280 (Bankr.W.D.Ky.1983) and *In re Brown*, 213 B.R. 317 (Bankr.W.D.Ky. 1997). In *Padgett*, the Court decided that § 362(b) did not apply where the debtor's alleged misconduct was not uncovered by an independent investigation by state au-

thorities and the criminal action was not instituted for purposes of protecting police and regulatory powers. There is nothing about the facts of this case that would indicate that the criminal actions taken against the Embertons were meant to enforce police or regulatory powers as provided for in the above exception. Indeed, there was no independent criminal investigation involved, only Mr. Lobb's request for action.

The testimony and evidence at trial support a finding that Mr. Lobb intentionally sought the Hart County Commonwealth Attorneys' assistance in instituting criminal proceedings against the Embertons to collect a debt and gain an advantage over other creditors in bankruptcy. While Mr. Lobb testified that he brought the matter to the County Attorney "to see if a crime had been committed," his actions also show that he was primarily interested in collecting his debt. He supplied the Contract, Plan and what he believed was the relevant information to the Hart County Attorney which was accepted by him and the Hart County Commonwealth's Attorney as fact.

The Court finds the demeanor of the witnesses and the documentary evidence taken as a whole as clear evidence of Mr. Lobb's desire to ensure collection of the sums paid to the Debtors. The Pretrial Diversion Agreements are premised on a successful completion of the Plan pertaining to the Lobbs. Further, Mr. Lobb included recovery of an additional $613.00 to his claim as part of the Pretrial Diversion Agreements and negotiations. Mr. Lobb was intimately involved in the negotiations of the Pretrial Diversion Agreements and it is doubtful the Commonwealth would have proceeded with the Agreements without his approval. The Court notes the indictments were based on erroneous information. While the Court cannot now determine the full extent of the representations to the Grand Jury, it is clear no one in that process properly evaluated. the plain terms of the Contract or the state of the title to the real estate.

The Court gives little credence to Defendants' arguments that restitution was a part of the Agreement simply because it was required by statute. Restitution and repayment of the debt were the motivating factors behind institution of the criminal proceedings against the Embertons. The acts that caused the Embertons' damage were the request to the County Attorney for the indictment, the indictment based on inaccurate information, the Embertons' incarceration and Mr. Lobb's participation in the pretrial diversion negotiations, which taken as a whole, indicate an intent to secure payment of a debt. "When restitution is the purpose of criminal proceedings, Congress' intent in enacting the federal bankruptcy laws is undermined by coerced payments through use of criminal process.... Also, the commencement and continuation of such criminal proceedings would impermissibly infringe on the benefits granted to debtors seeking the protection of bankruptcy courts." *Howard v. Allard,* 122 B.R. 696, 699 (W.D.Ky.1991). The Embertons were entitled to the full protection afforded debtors under the Bankruptcy Code, but that protection was circumvented by the Defendants' actions.

■ Having found a willful violation of the stay the Court is required to award the Embertons their actual damages. The evidence indicated that Mr. Emberton lost wages of $1,587.18 and Mrs. Emberton lost wages of $2,325.48. Additionally, the Embertons incurred attorneys' fees in connection with their defense of the criminal charges of $1,370.00. The Embertons are entitled to recover the $1,500.00 they were required to borrow from Mr. Emberton's employer for living expenses. The Em-

bertons also incurred $250.00 in telephone call charges from jail. The Embertons are also entitled to recover the $25.00 paid by Donald Emberton on the bond, which they will have to pay to him, as well as the $1,700.00 recovered by Mr. Lobb's son on the Tobacco Allotment Quota after the Contract was rejected. Thus, the Court awards the Embertons $8,758.21 in actual damages.

Included in the mandatory damage provisions of 11 U.S.C. § 362(b) is an award of attorneys' fees in connection with this proceeding. Plaintiffs, however, offered no proof at trial as to the amount of their attorneys' fees in connection with this proceeding. Therefore, the Court will allow Plaintiffs' counsel until June 1, 2001 to supplement the record with a detailed affidavit concerning attorneys' fees incurred in this proceeding.

■■■ Section 362(h) also authorizes an award of punitive damages where circumstances so warrant. Punitive damages have been awarded by this Court to serve as a deterrent to certain actions of creditors. *See e.g., In re Brown*, 213 B.R. 317 (Bankr.W.D.Ky.1997). The factors considered include the nature of the creditor's conduct, the creditor's ability to pay the damages and the creditor's motives, and any provocation by the debtor. *In re Johnson*, 253 B.R. 857 (Bankr.S.D.Ohio 2000). Retaliatory litigation to coerce settlement may serve as the basis for the assessment of punitive damages also. *Id.* It would be difficult to imagine a set of facts more egregious than those presented here, other than an intentional physical injury. Further, the testimony supported this Court's conclusion that Mr. Lobb is a landowner with substantial financial resources. Consideration of the factors enumerated above support an award of punitive damages in this case.

The Court finds Mr. Lobb's actions in initiating criminal proceedings against the Embertons after notification of the bankruptcy particularly egregious. The Court can only infer Mr. Lobb's anger and frustration at the filing of the Embertons' Chapter 13 and Plan. His actions were nothing short of vindictive. The Court cannot understand why he simply did not let his experienced bankruptcy counsel answer his questions and concerns and deal with his issues within the bankruptcy. Instead, he chose to go outside the bankruptcy arena and set into motion events that had profound negative impact on the Embertons. Mr. Lobb had the power to convince two separate elected officials to act on his word when the Contract and public records reflected contradictory information. Having had the demonstrated power to begin the process, the Court believes Mr. Lobb also had the power to stop it. There is no evidence in the record that the Defendants ever tried to ameliorate the damages caused to the Embertons.

The value of the loss of a person's freedom and dignity are difficult to quantify. The Court can only attempt to quantify that loss with a monetary award. In addition to the award of actual damages of $8,758.21, the Court awards the Embertons $26,274.63 in punitive damages, treble the amount of their actual damages. This award is meant to compensate the Embertons for their 21 days incarceration along with the attendant extreme emotional distress caused them. The award is also meant to serve as a deterrent to this type of overbearing activity by creditors.

■■ The monetary damages are awarded solely against Defendant Sidney Lobb. The Court has no evidence to support an award against Defendant Doris Lobb. The parties stipulated prior to trial that Defendant Geoghegan was not subject to damages. The Court, however, has the power

to enjoin Defendant Geoghegan from enforcing the Pretrial Diversion Agreements, which were entered into by the Embertons under duress. Thus, Defendant Geoghegan is permanently enjoined from enforcing the Pretrial Diversion Agreements against the Embertons.

Both Defendants are directed to take all actions required to vacate the Embertons plea entered in connection with this incident. The Court suggests that the parties facilitate this by use of an agreed order. Defendant Geoghegan is ordered to notify the Court once the Embertons' criminal records have been expunged of this matter.

Defendant Geoghegan is also directed to take all steps necessary to see that the bond purchased by Donald Emberton to obtain the Embertons' release from jail is released as soon as possible. Defendant Geoghegan is also to notify the Court once the bond is released.

Defendant Lobb is directed to immediately begin the process to return the Tobacco Quota Allotment to Mr. and Mrs. Emberton.

Failure to timely comply with any directive in this Memorandum–Opinion will place the Defendants in contempt of this Court.

### CONCLUSION

For all of the above reasons, the Court enters judgment in favor of the Plaintiffs Johnnie M. and Stacey A. Emberton and against the Defendants Sidney Lobb and Terry Geoghegan. A judgment accompanies these Findings and will be entered forthwith.

### JUDGMENT

Pursuant to the Memorandum–Opinion entered this date and incorporated herein by reference, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED AND ADJUDGED** that the Plaintiffs Johnnie M. and Stacey A. Emberton recover from Defendant Sidney Lobb the sum of $35,032.84 plus interest, from the date of this Judgment at the current federal judgment rate.

**IT IS FURTHER ORDERED AND ADJUDGED** that Defendant Terry Geoghegan is to take all necessary steps to see that the bond purchased by Donald Emberton to secure the release of the Plaintiffs from jail is released as soon as possible and Defendant Geoghegan is to notify the Court once it has been released.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Defendants are to take all actions required to vacate the plea entered by the Plaintiffs in connection with the incident referenced in the complaint herein. Defendant Geoghegan is to notify the Court once the Embertons' criminal records have been expunged of this matter.

**IT IS FURTHER ORDERED AND ADJUDGED** Defendant Geoghegan is permanently enjoined from enforcing the Pretrial Diversion Agreements entered into by the Embertons on October 6, 2000.

**IT IS FURTHER ORDERED AND ADJUDGED** that Defendants' failure to timely comply with any of the terms of this Judgment will subject the Defendants to the contempt powers of this Court.

**IT IS FURTHER ORDERED AND ADJUDGED** that Plaintiffs' counsel shall have to June 1, 2001 to supplement the record with a detailed affidavit on attorneys' fees incurred in this proceeding. Upon tender of same, the Court will make an award of a reasonable attorneys' fee and enter an Order making this Court's Judgment final and appealable.

**IT IS FURTHER ORDERED AND ADJUDGED** that Defendant Lobb is to immediately take all steps necessary to return the Tobacco Quota Allotment to the Plaintiffs.

This is not a final and appealable Judgment.